**Opinion issued November 8, 2018**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00413-CV

_____

## IN THE INTEREST OF L.M.N. AKA L.N., D.Y.L.N., AND J.J.L.N. AKA J.L.L., CHILDREN

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-01217J**

---

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellants, mother and father, challenge the trial

court's order, entered after a bench trial, terminating mother's parental rights to her

---

[1] *See* Tex. Fam. Code Ann. § 263.405(a) (Vernon 2014); Tex. R. App. P. 28.4.

minor children, L.M.N.,[2] D.Y.L.N., and J.J.L.N.[3] (collectively, "the children"),[4] and father's parental rights to his minor children, D.Y.L.N. and J.J.L.N.[5]  In five issues, mother contends that the trial court erred in appointing the Department of Family and Protective Services ("DFPS") as the permanent managing conservator[6] of the children and the evidence is legally and/or factually insufficient to support the trial court's findings that she knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being;[7] engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical and emotional well-being;[8] failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children;[9] and termination of her

---

[2]     We use the initials "L.M.N." when referring to the child named L.M.N., also known as L.N.

[3]     We use the initials "J.J.L.N." when referring to the child named J.J.L.N., also known as J.L.L.

[4]     When the trial court terminated the parental rights of mother and father, L.M.N. was nine years old, D.Y.L.N. was six years old, and J.J.L.N. was three years old.

[5]     The trial court terminated the parental rights of the unknown father of L.M.N.  He is not a party to this appeal.  Mother testified that L.M.N.'s father is deceased.

[6]     *See* TEX. FAM. CODE ANN. § 161.207(a) (Vernon Supp. 2018).

[7]     *See id.* § 161.001(b)(1)(D) (Vernon Supp. 2018).

[8]     *See id.* § 161.001(b)(1)(E).

[9]     *See id.* § 161.001(b)(1)(O).

parental rights was in the best interest of the children.[10]  In four issues, father contends that the trial court erred in appointing DFPS as the permanent managing conservator[11] of D.Y.L.N. and J.J.L.N. and the evidence is legally and factually insufficient to support the trial court's findings that that he knowingly placed, or knowingly allowed D.Y.L.N. and J.J.L.N. to remain, in conditions or surroundings which endangered their physical and emotional well-being;[12] engaged, or knowingly placed D.Y.L.N. and J.J.L.N. with persons who engaged, in conduct that endangered their physical and emotional well-being;[13] failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of D.Y.L.N. and J.J.L.N.;[14] and termination of his parental rights was in the best interest of D.Y.L.N. and J.J.L.N.[15]

We affirm.

---

[10]  *See id.* § 161.001(b)(2).

[11]  *See id.* § 161.207(a).

[12]  *See id.* § 161.001(b)(1)(D).

[13]  *See id.* § 161.001(b)(1)(E).

[14]  *See id.* § 161.001(b)(1)(O).

[15]  *See id.* § 161.001(b)(2).

## Background

On April 24, 2015, DFPS filed its third amended petition, seeking termination of mother's parental rights to the children, termination of father's parental rights to D.Y.L.N. and J.J.L.N., and managing conservatorship of the children.

At trial, DFPS caseworker Felicia Scott, who served as the caseworker in 2015, testified that the children entered the care of DFPS after allegations arose of physical abuse of L.M.N. When Scott spoke to mother regarding the allegations of physical abuse, mother stated that L.M.N. had fallen in the bathtub. Scott saw "bruises behind [L.M.N.'s] ear" and "a lot of scratches on the back of her neck."

Scott further testified that while the children were placed, pursuant to a parent-child safety plan, with family members or friends, mother and father had had unsupervised visits with them. In February 2015, Scott found the children at the home of mother and father and not at their designated placement. At the time, mother and father were aware that they were not to have unsupervised contact with the children.

DFPS caseworker Shanette McBride, who served as the caseworker from January 2016 to October 2016, testified that she observed family visits between mother, father, D.Y.L.N., and J.J.L.N.[16] Those visits occurred every two weeks for

---

[16] L.M.N. did not have visits or any contact with mother or father while McBride served as caseworker.

two hours. D.Y.L.N. was active during the visits and appeared happy to see mother and father, but she also did not smile and appeared "nonchalant." McBride opined that D.Y.L.N. was simply "going through the motion[s]." J.J.L.N. interacted with mother and father at the visits, but he did not cry when he had to leave. During one visit in October 2016, mother became "highly upset," very angry, and spoke in an "elevated" voice when McBride discussed the potential for an unrelated adoption of the children. Mother's conduct caused D.Y.L.N.'s demeanor to change.

In regard to mother and father, McBride noted that they consistently communicated with DFPS and completed their respective Family Service Plans ("FSPs"), with the exception that they were still participating in family therapy with D.Y.L.N.[17] McBride found the home of mother and father to be appropriate. However, she opined that mother and father had not learned from the programs in which they participated and their behaviors had not changed.

In regard to the children, McBride testified that they did not want to return home,[18] and L.M.N. was actually afraid to return home. Any discussion of mother with L.M.N. caused her to appear sad and scared, and she "put her head down." Further, when L.M.N. spoke about the physical abuse that she had suffered while

---

[17]   Neither L.M.N. nor J.J.L.N. participated in family therapy with mother and/or father while McBride served as caseworker.

[18]   D.Y.L.N. did not indicate that she wanted to see mother and father more than her regularly scheduled visits.

living with mother and father, she "look[ed] down" and was "very sad." L.M.N. feared that she would be abused again if she was returned home, and she was afraid that D.Y.L.N. and J.J.L.N. would also be abused. L.M.N. reported that, while living with mother and father, mother threw "cleaning supplies" and dishes at her and "hit her with brooms and mops." McBride opined that L.M.N. was the victim of physical abuse by mother.

McBride further explained that the children and their foster parents interacted positively with each other. The children were "very bonded" with their foster parents, who would take them on trips and to different activities. The foster parents "treated the[] [children] as their own"; "[t]hey felt like they were family." And the foster home is the only home that J.J.L.N. had ever known.

Moreover, the children thrived in their placement with their foster parents, who met the children's educational needs. L.M.N. was "an all-A student, [a] well-rounded student," and she had friends. She participated in gymnastics, and while McBride served as caseworker, D.Y.L.N. and J.J.L.N. attended daycare. None of the children had marks or bruises on them while living with their foster parents. McBride opined that it would be in the best interest of the children to remain in their current placement because they were thriving, mother and father had not demonstrated an ability to change their behavior, and mother had never taken responsibility for the injuries she had caused to L.M.N.

6

During McBride's testimony, the trial court admitted into evidence a "Permanency Plan and Progress Report to the Court," dated September 2, 2016.[19] The report states that L.M.N. did well in school and cared about others. She was very intelligent and maintained "an all[-]A average" at school. L.M.N. enjoyed walking, going on outings, watching cartoons, and drawing. She was proud of her new school supplies and new clothing. L.M.N. did not have any special needs, but participated in therapy "to address her emotions as to being in [foster] care and the abuse she endured while [living] with . . . mother and []father." And she was "doing extremely well" in her current placement, did not want to see mother, feared mother, and did not want to return home.

In regard to D.Y.L.N., the report states that she was "a joy." She attended pre-kindergarten for half of a day and enjoyed playing with L.M.N., the outdoors, watching cartoons, and coloring. She did not have any special needs, but wore glasses for her vision.

In regard to J.J.L.N., the report states that he was a happy child and loved to explore. He had mastered the ability to walk and attended daycare to meet his

---

[19] At the time of the report, L.M.N. was seven years old, D.Y.L.N. was four years old, and J.J.L.N. was almost two years old. The trial court also admitted into evidence a "Permanency Plan and Progress Report to the Court," dated May 16, 2016, which contained similar information.

7

educational needs. J.J.L.N. was able to walk, run, and say certain words. And he did not have any special needs.

In regard to mother and father, the report states that they had completed their parenting classes, psychosocial evaluations, individual therapy, and couples therapy. Mother had also completed her anger management classes. Mother and father had regular visits with D.Y.L.N. and J.J.L.N., and they participated in family therapy with those children. Mother, however, had not taken responsibility for the physical abuse that L.M.N. had suffered and her "stories" about the abuse were not consistent.

Current DFPS caseworker, Tychia Beaty testified that the children entered the care of DFPS after allegations arose of physical abuse of L.M.N. by mother. There were also allegations of abuse related to D.Y.L.N. and J.J.L.N. Initially, the children were placed with family members/friends pursuant to a parent-child safety plan, but the children's placement would allow mother to take the children to her home unsupervised. According to Beaty, it was mother's conduct and father's failure to protect the children that endangered them and caused them to enter the care of DFPS. Neither parent had ever taken responsibility for the physical abuse that L.M.N. had suffered.

During Beaty's testimony, the trial court admitted into evidence, the FSPs of mother and father, which state that L.M.N. had bruises "cover[ing] her back," arms, and the left side of her face. She "fear[ed] retribution." Mother had hit L.M.N., who

was six years old at the time, because the child "would not listen . . . and would tell [mother] that she [was] not her mother." Although mother admitted to hitting L.M.N., causing a bruise, on one occasion, she also gave several explanations as to how L.M.N. had sustained her many injuries, including falling off of her bicycle and being hit by her uncle.

Beaty further testified that mother and father completed their FSPs and visited regularly with D.Y.L.N. and J.J.L.N.[20] However, mother did not appropriately correct D.Y.L.N.'s improper behavior during visits with the child. For instance, if D.Y.L.N. yelled or screamed at a visit, mother could not stop her or redirect the behavior. Beaty noted that father's visits with D.Y.L.N. and J.J.L.N. were appropriate and she had not seen him act angrily. Beaty opined that although mother and father had completed their FSPs, they had not learned from the programs in which they were required to participate.

During Beaty's testimony, the trial court also admitted into evidence a "Permanency Plan and Progress Report to the Court," dated December 4, 2017, which states that although mother and father "ha[d] worked services," "mother ha[d] not learned from [her participation in] the [programs]" and it was questionable as to whether father could protect the children if they were returned home. Further, the

---

[20] Beaty could not confirm whether mother and father had been consistently paying, as ordered by the trial court, child support while the children were in the care of DFPS.

9

report notes that the children's therapist believed that it would be in their best interest to remain in their current placement because of the "severity of abuse" that L.M.N. had endured while living with mother and father. And allowing the children to return to the care of mother and father would "re-traumatiz[e]" them. D.Y.L.N. did not want to return home, and J.J.L.N. only knew his home with his foster parents.

In regard to the children, Beaty noted that neither L.M.N. nor D.Y.L.N. wanted to return home. And L.M.N. appeared sad and upset and "look[ed] down at the floor" whenever the subject of returning home was discussed. According to L.M.N., mother was "mean to her," "whoop[ed] her," and "hit her."[21]

The trial court also admitted into evidence photographs of L.M.N. that had been taken by DFPS after the children had been removed from the care of mother and father. Beaty explained that the photographs show a visible bruise on L.M.N.'s cheek, "several bruises on her back," and visible bruises on her arm. Beaty opined that the bruising was not the result of "a one[-]time event" and returning L.M.N. to the care of mother would be "re-traumatizing" for her. Further, mother's history of abusing L.M.N. constituted conduct that had put the children in physical and emotional danger. As Beaty explained, the fact that one child had sustained injuries in the home of mother and father endangered the other children who were also in the home. Beaty further opined that father could not protect D.Y.L.N. and J.J.L.N. if

---

[21] Beaty noted that mother and L.M.N. had not had contact since 2015.

they were returned home because L.M.N. had sustained physical abuse while father lived in the home and he "did not do anything when th[at] abuse was going on." Beaty also noted that father had continued to support mother throughout the case, and she was concerned about returning D.Y.L.N. and J.J.L.N. to father's care given that he had continued to live with mother in spite of the evidence of physical abuse. Father never offered any alternative living arrangement for D.Y.L.N. and J.J.L.N.

According to Beaty, the children were doing well and had adjusted to their current placement. And she opined that they had a strong bond and it was in their best interest to remain together. Mother, however, wanted all of the children returned to her care.

Child Advocates Inc. ("Child Advocates") volunteer Martha Gomez testified that she was appointed as the children's guardian ad litem in May 2015. When she spoke to mother about "the incident" that prompted the children to enter the care of DFPS, mother told her that she had been "having problems" with L.M.N. because L.M.N.'s grandmother had "manipulat[ed] [her] into . . . believ[ing that] she was [L.M.N.'s] biological mother" and L.M.N. had refused to call mother her "[m]other," which was frustrating. (Internal quotations omitted.) Mother admitted that she had "hit [L.M.N.] one time with a shoe" (the "shoe incident"), but she did not admit to any other forms of violence or abuse related to the child. Father told

11

Gomez that the children had entered the care of DFPS because "there w[ere] problems with [L.M.N.]"

According to Gomez, while the children were in the care of mother and father, mother "would put [L.M.N.'s] hands under the hot water faucet" and "hit [her] with a belt on her arms." Mother also hit L.M.N. "on the head with a cell phone charger," "hit [her] with a broom," and "pushed [her] into a door," causing her to bleed and require stitches. L.M.N. said that these incidents of physical abuse had occurred at different times, and she indicated to Gomez that she had been physically abused on several occasions.

In regard to mother and father, Gomez noted that over the course of the instant case, their "stories about what brought the children into care [had] change[d]," with mother stating that "she didn't have any anger issues," "she didn't understand why she was made to take anger management classes," and she had hit L.M.N. "because she [had been] taking Prozac and . . . experiencing depression because of [her] pregnancy" with J.J.L.N. These statements by mother concerned Gomez because, at the time that she made them, mother had already completed her FSP and participated in anger management classes; however, she still "didn't feel like she had any anger management issues." Gomez opined that father was not protective of the children and "could not speak up for himself or speak out

12

independently." Further, he had not demonstrated how he would protect the children in the future if they were returned home.

According to Gomez, mother needed "to take responsibility for the physical abuse of [L.M.N.]" and father needed "to take responsibility [for not] . . . being protective" of the child. Although L.M.N. sustained "all [of] these bruises" and "injuries" while in the care of mother and father, neither party could explain how they had occurred, except for mother admitting to having hit L.M.N. on one occasion.[22]

In regard to their visits with D.Y.L.N. and J.J.L.N., Gomez, who had observed "10 to 12" visits, testified that mother and father would "split their time up" between J.J.L.N. and D.Y.L.N. J.J.L.N. did "very well" during the visits, but D.Y.L.N. "require[d] a lot of attention." Mother and father had difficulty directing her. And during one visit, mother became so "agitated" with Gomez that Gomez had to leave.

In regard to the termination of the parental rights of mother and father, Gomez explained that she was concerned about returning the children to the care of mother and father because of the "severe physical abuse" suffered by L.M.N. and the risk that D.Y.L.N. and J.J.L.N. would also be physically abused. Gomez opined that L.M.N. should not have any contact with mother "[b]ecause of the severe physical

---

[22] Gomez opined that a "one-time hitting" incident was not "consistent with all of the bruising and all of the scars" found on L.M.N.

13

abuse that she[] had to endure, the severe trauma and the fact that she [was] afraid of her mother."[23] L.M.N. did not want to see mother, which "confirm[ed] that she ha[d] been through severe trauma, severe physical abuse." She was also "afraid for her siblings" to be returned to the care of mother and father. Gomez did not recommend reunification, but rather the termination of the parental rights of mother and father. Gomez opined that the children would be in "grave danger" if they were returned to the care of mother and father, as evidenced by the physical abuse that L.M.N. had suffered. And because father was unable to demonstrate how he would protect the children if they were returned home.

In regard to the children's current placement, Gomez testified that they had been living with their foster parents since 2015 and were "doing well" and "thriving." The children did well in school, and L.M.N. and D.Y.L.N. wanted to "remain with their foster parents."[24] In their rooms at their foster parents' home, the children had toys, books, beds, and stuffed animals. The children's foster parents did not neglect them, and Gomez had not observed any torn clothing on the children. The children were happy in their placement, and Gomez opined that it was in their best interest for them to remain there because it was a safe and stable home.

---

[23] Gomez explained that L.M.N.'s therapist also recommended that she have no contact with mother.

[24] Gomez noted that D.Y.L.N. had spent the majority of her life living with her foster parents.

During Gomez's testimony, the trial court admitted into evidence a "Court Report" from Child Advocates dated November 2017. The report states that "[o]n November 13, 2014, [DFPS] received a referral alleging physical abuse of [a then] 6 year old [L.M.N.] by [mother]." L.M.N. had gone to school with "two black eyes that were swollen and black in color." "Her back, arms and hands were also full of discolored and scattered bruises."[25] L.M.N. stated that "her sibling hit her with a toy car . . . on the left eye and that the phone hit her on her right eye." Her "lip also had a blister which may or may not have been a fever blister."

The Court Report also notes that the children lived together in the same foster home, where they had been living since 2015. The children "ha[d] adjusted well to th[eir] placement," which was meeting their emotional, psychological, and physical needs. L.M.N. was in third grade "bilingual classes and [was] comfortable and underst[ood] English and Spanish." Her teachers did not have any behavioral or academic concerns. D.Y.L.N. was in "kindergarten and . . . doing very well." "She [had] mastered all objectives . . . and received all S's on her report card." Her teacher reported that she was "doing better than most of her class in writing and [she was] in one of the higher reading groups." J.J.L.N. attended daycare and was

---

[25]     Gomez testified that mother and father had no explanation "for all of the bruising on [L.M.N.]" or "for all of the scars that she ha[d]."

developmentally on target. Child Advocates recommended that the children stay in their current placement.

Dr. Melissa Earls, the children's therapist, testified that in regard to L.M.N., she had "directly communicate[d] her desire to stay with her current foster family." L.M.N. feared returning home, her mother, and being "hurt" again. And when L.M.N. stated, "I don't want to be hurt," she meant she did not want to suffer more physical bodily harm. (Internal quotations omitted.) L.M.N. disclosed that mother had hit her, "ignored" her, and "put [her] in" or "locked" her in a closet. L.M.N. told Earls, "I do not want to go back." (Internal quotations omitted.) L.M.N. had a strong bond with her siblings and with her foster parents. And Earls opined that she should remain with her foster parents, who were meeting her physical and emotional needs.

In regard to D.Y.L.N., Dr. Earls explained that she had a strong bond with her siblings and with her foster parents. D.Y.L.N. wanted to stay in her current placement, she was afraid to return home, and she was afraid to be taken away from her foster parents. She told Earls that while living with mother and father, she "had been left in a closet" so that she would "not see [L.M.N. being] hurt" (the "closet incident"). However, while living with mother and father, she had actually seen L.M.N. "being hit." And when she told Earls this, D.Y.L.N. appeared "[s]haken."

16

Dr. Earls further noted that she saw D.Y.L.N. for an "emergency [therapy] session" after she had a visit with mother and father. D.Y.L.N. was upset and tearful after the visit because mother had said that she "ha[d] to come home." (Internal quotations omitted.) According to Earls, on at least four occasions, she had to speak to the children after visits with mother and father in order to ease "their anxiety and fears about returning." Earls opined that D.Y.L.N. should be placed with her foster parents because she was "thriving" "in [the] emotionally supportive home."

In regard to J.J.L.N., Dr. Earls noted that he was young and appeared to be "[v]ery happy, playful, [and] very bright." He had a strong bond with his sisters and his foster parents.

Dr. Earls further opined that the children's current placement was safe, and they had not expressed any fears related to their foster parents. And the children had never reported any abuse or neglect by their foster parents. According to Earls, it would be emotionally detrimental if either L.M.N. or D.Y.L.N. were returned to the care of mother and father.

J.C., the children's foster father, testified that he currently lives in a house with his wife, his nine-year-old daughter, and the children. J.C. is employed, his wife is a student nurse, and they own their home. L.M.N. and J.J.L.N. came to live with J.C.'s family in November 2015, and D.Y.L.N. came to live with them in

December 2015 so that the children could all be together.[26]  At the time of trial, the children had been living with his family for almost three years.  J.C. and his wife provided the children with food, clothing, and "everything [that] they needed."  And they had recently taken the children to visit San Diego for spring break.

In regard to L.M.N., J.C. explained that when she first came to live with his family, she was timid, shy, cautious, and nervous.  She was in the first grade, but not doing well in school.  Now, L.M.N. is in third grade at "a special Spanish speaking school" and is performing "impressive[ly]."  She is on the "A/B honor roll" and enjoys science and reading.  She has friends at school and in the neighborhood.  L.M.N. plays with her friends at the park in front of J.C.'s house and has participated in soccer and karate.  She speaks both English and Spanish, is "a very outdoor person," "loves outside activities," and camping, which the family does frequently.  L.M.N. gets along well with her siblings, has a good relationship with both D.Y.L.N. and J.J.L.N., and is very bonded with them.  She is protective of D.Y.L.N. and J.J.L.N., and she engages and plays with them.  After school, L.M.N. and D.Y.L.N. do their homework together and play with dolls.  The children "hug each other a lot."

---

[26]  At the time, L.M.N. was six years old, D.Y.L.N. was three years old, and J.J.L.N. was almost a year old.

J.C. opined that if L.M.N. was returned to the care of mother, she would be "devastated," "frightful," and "scared," and "she would digress in school." L.M.N. had not seen her mother since she came to live with J.C.'s family, and she had actively hidden from mother in the car when J.C. had taken or picked up D.Y.L.N. and J.J.L.N. from family visits. L.M.N., who had "ma[de] it a point not to see" mother, had disclosed to J.C. some of the abuse that she had suffered while living with mother and father, including having her hand put under hot water, being pushed into doors, and being forced to do work. And L.M.N. had stated that she did not want to return home.

In regard to D.Y.L.N., J.C. explained that when she came to live with his family, "[t]he world revolved around her" and "she always wanted a lot of things." She would "tell on [L.M.N.] even if [L.M.N.] didn't do [anything] wrong," and she would pull J.J.L.N.'s hair. However, D.Y.L.N.'s relationship with her siblings had improved, and she is now very bonded with them. She is a "great big sister" to J.J.L.N., plays with him, is very close with him, holds his hand, and is protective. Currently, D.Y.L.N. is in kindergarten and "doing great." She "show[s] progress from semester to semester," and she attends the same school as J.C.'s nine-year-old daughter. D.Y.L.N. has friends and plays with them at the park and the neighborhood pool. She primarily speaks English now and refuses to speak Spanish,

19

although she understands it.[27] D.Y.L.N. enjoys swimming, riding her bicycle, and "playing on a power wheels."[28]

In regard to D.Y.L.N.'s visits with mother and father, J.C. noted that she always "want[ed] to go home right away" after each visit. She would run to him after visits and was excited to see him. Because she would not hug mother and father on her own, J.C. would prompt her to do so. J.C. opined that the visits between D.Y.L.N., mother, and father were "[h]urtful" for her because she does not want to go. And D.Y.L.N. had disclosed the "closet incident" to him.

In regard to J.J.L.N., J.C. explained that he was previously in daycare, but is now being tutored by J.C.'s in-laws, who are former teachers. J.J.L.N. was doing great at daycare and is doing "really good" with tutoring. He is developmentally on target for his age and does not have any delays. He gets along with both L.M.N. and D.Y.L.N. and is very bonded with them. He asks his sisters to play, go swimming, and watch Mickey Mouse with him. The children play together often, and J.J.L.N. eats snacks with his sisters when they get home from school.

---

[27] The record indicates that mother and father speak Spanish exclusively. And mother testified that she does not speak or read English.

[28] J.C. noted that while D.Y.L.N. was living with him, she told him that "she [had] burned herself on the exhaust pipe" of the family's recreational vehicle; however, J.C. never observed a "burn mark." While viewing a photograph of the "burn mark" at trial, J.C. opined that it was small and "looked more like a red mark, like an ant bite."

20

In regard to his visits with his parents, J.J.L.N. is indifferent. He does not "cry or anything," but is excited when J.C. picks him up after a visit. J.C. noted that J.J.L.N. recently "fell on some toys when he got excited," which resulted in a bruise.

J.C. further testified that he and his wife would like to adopt the children, and he opined that it would be in the children's best interest to be adopted by his family.[29] J.C. explained that L.M.N. "ha[d] expressed concern about returning to her mother because of the abuse" and D.Y.L.N. "ha[d] grown accustomed to [his family] and now only speaks English," which would be a difficulty if she returned home. Further, J.C.'s family is the only family that J.J.L.N. has ever known, as he spent "less than a few months with . . . mother." Moreover, J.J.L.N. did not see mother and father as his parents, and it would be detrimental to return him to their care.

J.C. opined that it would be harmful if the children were separated because D.Y.L.N. would think that she did something "wrong," this "would be detrimental to her development," and "the only consistent thing in [J.J.L.N.'s] life ha[d] been [L.M.N.]." The children wanted to stay together in J.C.'s home and it would be emotionally difficult for them to be separated. And L.M.N. and D.Y.L.N. had expressed fears about returning home. The children refer to J.C. and his wife as "[d]ad" and "[m]om" and refer to mother and father by their names or as "[a]unt and

---

[29] J.C. noted that even if D.Y.L.N. and J.J.L.N. were returned to the care of mother and father, he and his wife still wanted to adopt L.M.N.

[u]ncle." And J.C. further opined that J.J.L.N. did not realize that mother and father were his parents and D.Y.L.N. saw J.C. and his wife as "her parents."

Mother testified that DFPS became involved with the children on November 14, 2014 after she hit, with a shoe, her then six-year-old daughter, L.M.N.[30] According to mother, the "shoe incident" was the only time that she had ever hit L.M.N., who sustained bruises as a result, but mother could not recall how many times that she had hit her with the shoe.[31] At the time, D.Y.L.N. was sleeping and mother was pregnant with J.J.L.N. Mother explained that she had hit L.M.N. because L.M.N. "ke[pt] telling [her] that . . . [she was] going to go to Mexico,"[32] yelled at her, and threw "food away," saying that "she wasn't going to eat." Mother also noted that she had been taking "pills" "for [her] blood pressure," which caused her to "feel changes," and she felt like "crying all the time." L.M.N. would then tell mother that she "wasn't her mother" and she wanted to return to Mexico, which caused mother to feel sad and "bad." Mother then "los[t] [her] temper" and hit L.M.N. The next day, DFPS removed the children from the care of mother and father after L.M.N. had gone to school.

---

[30] At the time, L.M.N. also had a blister on her lip, which mother asserted came from L.M.N. biting her lips after a dentist "put some anesthesia in her gums."

[31] Mother denied causing the scar on L.M.N.'s head.

[32] Mother noted that L.M.N. had lived in Mexico with her grandmother until she was three years old. Mother then brought her to Texas to live with her and father.

22

Mother explained that she would also discipline L.M.N. by "ignor[ing] her," "tak[ing] away her toys," and "not let[ting] her watch TV."[33] Mother admitted to having problems controlling her anger, and she agreed that she had, in the past, "exhibited some uncontrollable anger" toward L.M.N. However, mother also asserted that she did not have any "anger issues." And mother noted that she had not seen L.M.N. since 2015.[34]

After removing the children from mother and father's care, DFPS placed them with several family members and/or friends, pursuant to a parent-child safety plan. Mother denied removing the children from those placements and having unsupervised contact with the children during that time. However, mother noted that father had had unsupervised contact with the children on one occasion and brought the children home.

In regard to her visits with D.Y.L.N. and J.J.L.N., mother explained that she had told the children that they were "coming home" and D.Y.L.N. was happy to see her and hugged her at visits. And D.Y.L.N. cried at the end of every visit because

---

[33]   Mother stated that she had never hit D.Y.L.N. or J.J.L.N. and they did not need to be disciplined because they were too young.

[34]   Mother further noted that while the children were still in her care, she had boiled tomatoes in a pot and left them on the kitchen stove while she went to the restroom. She then heard L.M.N. scream, and she saw that the pot with the boiling tomatoes had fallen on L.M.N.'s hand.

she "d[id] not want to go with the foster[] [parents]." Moreover, at two visits, mother noticed that D.Y.L.N.'s underwear was torn and dirty.

In regard to her FSP, mother testified that she had completed a psychological evaluation, a drug and alcohol assessment,[35] individual therapy, group/family therapy, parenting classes, and anger management classes. She also provided the DFPS caseworker with proof of employment and stable housing. Mother had a stable income, worked in a clothing factory, and lived in a house with three bedrooms and two bathrooms. She had been paying child support while the children were in the care of DFPS and had complied with all of the recommendations that were required by her psychological evaluation. And mother had maintained contact with her DFPS caseworker and had not missed any meetings or visits with the children.

Further, mother noted that if the children were returned to her care, she "would tell them how much [she] love[s] them" and "would make them happy every day." She would also not "pay attention to the bad things" and "only pay attention to the good things." Mother admitted that it was wrong of her to hit L.M.N. and she would like an opportunity to "do things right." According to mother, she should play with the children more, spend more time with them, and not focus on "things that need[]

---

[35] Mother noted that she had submitted to random narcotics testing as required and DPFS had never expressed concern about narcotics or alcohol use.

to be done around the house." She should "[f]ocus on their education" and "treat [the] children better."

Father testified that he is the father of D.Y.L.N. and J.J.L.N. On the day of the "shoe incident," while he was at work, mother hit L.M.N. In general, father worked 7:00 a.m. to 6:00 p.m. Monday through Friday, and a "[h]alf day" on Saturday. While he worked, mother cared for the children. Father was not concerned about mother's anger issues and did not believe that she needed to participate in any of DFPS's programs.[36] Father had never seen mother hit the children, and he had never seen problems between mother and L.M.N. He also had never seen mother "stressed out" or "ill-tempered" while the children were in her care. However, he admitted that he did know that mother would become easily overwhelmed and he had never actually asked her if she had ever hit any of the children.

According to father, when L.M.N. first came to live with him and mother, she missed her grandmother in Mexico and did not want to be in their home. But, after that, everything was "normal," even though he admitted that mother and L.M.N. had participated in therapy together before DFPS became involved with the children. Further, although father knew that L.M.N. would "get kind of upset sometimes" and she "wanted to go back to Mexico," he was surprised that mother had hit L.M.N.

---

[36] Father also testified that mother "[p]reviously" had anger issues.

After the "shoe incident," father was worried that the children would be taken away. He referred to the "shoe incident" as an "accident" and minimized it, blaming it on mother's medication.

Father explained that he had never seen any bruises or marks on L.M.N. because he did not arrive home until after the children were already dressed and he did not unclothe them. However, he did play with the children upon arriving home, and he and mother would take L.M.N. to school. Father opined that mother did not have "a good reason" to hit L.M.N., but he was not concerned that she would ever hit D.Y.L.N. because she had never lost her temper with her.

Father noted that while the children were in a placement, pursuant to a parent-child safety plan, he, on one occasion, took the children, unsupervised, out of their placement and to his home to see his brother.

In regard to his FSP, father testified that he had received his FSP and completed a psychological evaluation, parenting classes, and individual therapy. He had provided DFPS with proof of employment and had attended group/family therapy sessions, meetings, court settings, and every visit with D.Y.L.N. and J.J.L.N.[37] He submitted to random narcotics testing, and DFPS had never raised any concern about the results of those tests. Although father had not paid child support while the children were in the care of DFPS, he noted that the programs that he

---

[37] Father opined that the family was happy during their visits.

26

participated in pursuant to his FSP "helped [him] a lot." He explained that he had not done anything that warranted termination of his parental rights, and he opined that his and mother's parental rights should not be terminated.

Father further testified that he still lives in the same home as mother, he continues to work full-time, and mother is pregnant with twins. If the children were returned to the care of mother and father, he would "[p]ay more attention to them" and "dedicate more time to them." Father stated that, in the past, he had "concentrat[ed] too much on [his] job and [did] not think[] about what could be going on," but if the children ever again expressed feelings of wanting to leave the home or the care of mother and father, he would talk to mother and the children. Although he will "be busy," he plans to "have more precaution[s] to check" on the children if they are returned to his and mother's care. When asked "what precautions [he] would . . . tak[e] to make sure" that a child was not hit again, father stated that he and mother "ha[d] talked about that a lot." And she "felt really bad," which is why she hit L.M.N.

**Standard of Review**

A parent's right to "the companionship, care, custody, and management" of her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the

27

interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable

to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.* In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In conducting a factual-sufficiency review in a parental-rights-termination case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could

29

not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

**Sufficiency of Evidence**

In her first, second, third, and fourth issues, mother argues that the trial court erred in terminating her parental rights to the children because the evidence is legally and/or factually insufficient to support the trial court's findings that she knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being; she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical and emotional well-being; she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children; and termination of her parental rights was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (b)(2) (Vernon Supp. 2018).

In his first, second, and third issues, father argues that the trial court erred in terminating his parental rights to D.Y.L.N. and J.J.L.N. because the evidence is

legally and factually insufficient to support the trial court's findings that he knowingly placed, or knowingly allowed D.Y.L.N. and J.J.L.N. to remain, in conditions or surroundings which endangered their physical and emotional well-being; he engaged, or knowingly placed D.Y.L.N. and J.J.L.N. with persons who engaged, in conduct that endangered their physical and emotional well-being; he failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of D.Y.L.N. and J.J.L.N.; and termination of his parental rights was in the best interest of D.Y.L.N. and J.J.L.N. *See id.*

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated under Texas Family Code section 161.001(b)(1) and that termination is in the best interest of the child. *See id.* § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Notably though, "[o]nly one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

31

*Endangering Conduct*[38]

In her first issue, mother argues that the evidence is legally and factually insufficient to support the trial court's termination of her parental rights to the children under section 161.001(b)(1)(D) because there is "no evidence" of "any inherently dangerous conditions of the children's environment prior to removal" or that "the children's conditions or surroundings prior to removal endangered their physical or emotional well[-]being." In her second issue, mother argues that the evidence is factually insufficient to support the trial court's termination of her parental rights to L.M.N. under section 161.001(b)(1)(E) and legally and factually insufficient to support the termination of her parental rights to D.Y.L.N. and J.J.L.N. under section 161.001(b)(1)(E) because although "the shoe incident might be sufficient to terminate [her] parental rights [as to L.M.N.]," mother was dedicated to her children; remorseful; had completed her FSP; had "learned how to be a better parent and to manage anger issues"; and had worked diligently in trying to reunite with her children. And she asserts that "[t]here is no evidence" or "scant evidence" that she engaged, or knowingly placed D.Y.L.N. and J.J.L.N. with persons who engaged, in conduct that endangered their physical and emotional well-being.

---

[38] Because the evidence related to Texas Family Code sections 161.001(b)(1)(D) and (E) are interrelated, we consolidate our examination. *See Asjes v. Tex. Dep't of Protective & Regulatory Servs.*, 142 S.W.3d 363, 371 (Tex. App.—El Paso 2004, no pet.); *In re J.T.G.*, 121 S.W.3d 117, 126 (Tex. App.—Fort Worth 2003, no pet.).

In his first issue, father argues that the evidence is legally and factually insufficient to support the trial court's termination of his parental rights to D.Y.L.N. and J.J.L.N. under section 161.001(b)(1)(D) because "there is . . . no clear and convincing evidence that [he] was aware [that] [m]other might have been physically abusing [L.M.N.] when they lived together or during the time [that] she lived in the DFPS approved [Parent Child Safety] placements" and "what evidence there is of exposing [D.Y.L.N. and J.J.L.N.] to danger pertains almost exclusively to [m]other's actions against [L.M.N.] and [f]ather's alleged failure to protect her and not to [D.Y.L.N. and J.J.L.N.]'s physical environment before being removed." Further, father argues that the evidence is legally and factually insufficient to support the trial court's termination of his parental rights to D.Y.L.N. and J.J.L.N. under section 161.001(b)(1)(E) because he "didn't observe th[e] [shoe] incident"; L.M.N. "never stated [that] [f]ather witnessed the abuse," she informed him of it, or that "it occurred when he was home"; D.Y.L.N. did not disclose that she was placed in a closet until after she "had lived well over half [of] her life outside of her parents' home"; and there is no evidence that father neglected D.Y.L.N. or J.J.L.N., was not protective of L.M.N., or that if D.Y.L.N. and J.J.L.N. were returned, they "would be [at] risk" of being abused.

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or

33

knowingly allowed [a] child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" and termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (b)(2). A trial court may also order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed [a] child with persons who engaged in conduct which endangers the physical or emotional well-being of the child" and termination is in the best interest of the child. *Id.* § 161.001(b)(1)(E), (b)(2).

Both subsections D and E require proof of endangerment. To "endanger" means to expose a child to loss or injury or to jeopardize her emotional or physical health. *Boyd*, 727 S.W.2d at 533 (internal quotations omitted); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (internal quotations omitted). A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *J.S. v. Tex. Dep't of Family & Protective Servs.*, 511 S.W.3d 145, 159 (Tex. App.—El Paso 2014, no pet.). Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. However, it is not necessary that the endangering conduct be directed at the child or that the child actually suffer

injury.  *Id.*  Endangerment can be exhibited by both actions and failures to act.  *In re*

*U.P.*, 105 S.W.3d 222, 233 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

While both subsections D and E focus on endangerment, they differ regarding

the source of the physical or emotional endangerment to the child.  *See In re B.S.T.*,

977 S.W.2d 481, 484 (Tex. App.—Houston [14th Dist.] 1998, no pet.).  Subsection

D requires a showing that the environment in which the child is placed endangered

her physical or emotional health.  *Doyle v. Tex. Dep't of Protective & Regulatory*

*Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied); *see also In re*

*M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) ("Under

subsection (D), it is necessary to examine evidence related to the environment of the

child to determine if the environment was the source of endangerment to the child's

physical or emotional well-being."); *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—

Houston [14th Dist.] 2005, no pet.).  Conduct of a parent or another person in the

home can create an environment that endangers the physical and emotional

well-being of a child.  *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth

1995, no writ); *see also In re K.M.*, No. 02-18-00073-CV, 2018 WL 3288591, at *7

(Tex. App.—Fort Worth July 5, 2018, pet. denied) (mem. op.) (parent's conduct can

contribute to endangering environment); *In re I.L.L.*, No. 14-09-00693-CV, 2010

WL 4217083, at *6 (Tex. App.—Houston [14th Dist.] Oct. 26, 2010, no pet.) (mem.

op.) (although subsection D concerns child's living environment rather than conduct

of parent, parental conduct certainly relevant to child's environment).  For instance, abusive or violent conduct by a parent is a part of the "conditions or surroundings" of the child's home and may produce an environment that endangers her physical or emotional well-being.  *In re K.C.F.*, No. 01-13-01078-CV, 2014 WL 2538624, at *12 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.); *In re M.R.J.M.*, 280 S.W.3d at 502; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet).  The relevant time frame for establishing that a parent "knowingly . . . allowed [a] child to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child" is prior to the child's removal.  *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied) (first and third alterations in original) (internal quotations omitted).

Further, a fact finder may infer from a parent's past conduct endangering the well-being of a child that similar conduct will recur in the future.  *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.); *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.) (trier of fact may measure parent's future conduct by past conduct).  And a parent's endangering conduct toward other children may be considered to determine whether the parent engaged in behavior that endangered the child at issue.  *See In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *11 (Tex. App.—Fort Worth Oct.

12, 2017, no pet.) (mem. op.). Subsection D permits termination based upon a single act or omission. *Jordan*, 325 S.W.3d at 721.

Under subsection E, the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of a parent's conduct, including acts, omissions, or failures to act. *In re J.T.G.*, 121 S.W.3d at 125; *see also In re S.M.L.*, 171 S.W.3d at 477. It is not necessary to establish that a parent intended to endanger the child in order to support termination of the parent-child relationship. *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (neglect, even in absence of physical abuse, may endanger child's physical or emotional well-being). However, termination under subsection E requires "more than a single act or omission; . . . a voluntary, deliberate, and conscious course of conduct by the parent" is required. *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.— Houston [1st Dist.] 2016, pet. denied); *see also In re J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone, even if the conduct is not directed at the child and she suffers no actual injury. *See Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). Courts may consider parental conduct that did not occur in the child's presence, including conduct before the child's birth and after she was removed by DFPS. *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.— Houston [1st Dist.] 2015, no pet.); *Walker*, 312 S.W.3d at 617; *see also In re J.O.A.*,

283 S.W.3d 336, 345 (Tex. 2009) ("[T]he endangering conduct may include the parent's actions before the child's birth[] [and] while the parent had custody of older children . . . .").

Here, the children entered the care of DFPS after allegations arose of physical abuse of a then six year old L.M.N. by mother. L.M.N. disclosed to several adults involved in the instant case that mother had repeatedly physically abused her by throwing "cleaning supplies" and dishes at her and "hit[ting] her with brooms and mops." Further, mother "put [L.M.N.'s] hands under the hot water faucet" and "hit [her] with a belt on her arms." Mother hit L.M.N. "on the head with a cell phone charger" and "pushed [her] into a door," causing her to bleed and require stitches. L.M.N. stated that mother was "mean to her," "whoop[ed] her," "hit her," "ignored" her, and "put [her] in" or "locked" her in a closet.[39] L.M.N. told her therapist, Dr. Earls, "I don't want to be hurt" again, meaning she did not want to suffer more physical bodily harm perpetrated by mother. (Internal quotations omitted.)

A "Court Report" from Child Advocates, admitted into evidence at trial, states that "[o]n November 13, 2014, [DFPS] received a referral alleging physical abuse of [a then] 6 year old [L.M.N.] by [mother]." L.M.N. went to school with "two black

---

[39]  L.M.N. disclosed to her foster father, J.C., that she had suffered abuse while living with mother and father, including having her hand put under hot water, being pushed into doors, and being forced to do work.

eyes that were swollen and black in color."[40]  "Her back, arms and hands were also full of discolored and scattered bruises" and her lip "had a blister which may or may not have been a fever blister."

Photographs of L.M.N., admitted into evidence at trial, show visible bruises on the child's face, arm, and back.  And the FSPs of mother and father state that L.M.N., when she entered care, had bruises that "covered her back," "both arms," and the left side of her face.  DFPS caseworker Scott testified that she saw "bruises behind [L.M.N.'s] ear" and "a lot of scratches on the back of her neck."  And DFPS caseworker Beaty opined that the bruising on L.M.N. did not appear to be the result of "a one[-]time event."  Child Advocates volunteer Gomez similarly opined that a "one-time hitting" incident was not "consistent with all of the bruising and all of the scars" found on L.M.N.'s body.  L.M.N. disclosed to Gomez that the incidents of physical abuse by mother occurred at different times and she had been physically abused by mother on several occasions.

The record further indicates that L.M.N. is afraid of mother and afraid to return home.  When L.M.N. spoke about the physical abuse that she had suffered, she appeared sad and scared, and she "put her head down."  L.M.N. was afraid that she would be abused again if she was to be returned to the care of mother, and she was afraid that D.Y.L.N. and J.J.L.N. would also be physically abused if they were

---

[40]     While L.M.N. was in their care, mother and father took her to school.

returned home. Throughout the pendency of this case, L.M.N. did not want to see mother, actively hid from her, and repeatedly stated that she did not want to return home. Beaty testified that L.M.N. would be "re-traumatiz[ed]" if she was to be returned to the home of mother and father. And L.M.N.'s therapist recommended that she have no contact with mother due to the "severe physical abuse" that she had suffered.

Mother admitted to hitting L.M.N. on one occasion with a shoe, but could not recall how many times that she had actually hit her with the shoe,[41] and L.M.N. sustained a bruise as a result of being hit. Mother, in the past, had given several explanations as to how L.M.N. had sustained her many of injuries, including falling off of her bicycle, falling in the bathtub, and being hit by her uncle.

A "Permanency Plan and Progress Report to the Court," admitted into evidence at trial, states that mother's "stories" regarding the physical abuse of L.M.N. were not consistent. In regard to the "shoe incident," mother stated that she had hit L.M.N. because she "would not listen . . . and would tell [mother] that she [was] not her mother." L.M.N.'s refusal to call mother her "[m]other" frustrated her and caused her to feel sad and "bad." Mother also stated that L.M.N. yelled at her and threw "food away," saying that "she wasn't going to eat." Mother, however,

---

[41]     Mother also recalled an incident, while L.M.N. was in her care, when a pot of boiling tomatoes fell on L.M.N. after mother had left it unattended on the kitchen stove.

excused her behavior in hitting L.M.N. by blaming it on "depression" and the "taking [of] Prozac." At trial, mother admitted to having problems controlling her anger and that she had lost her temper with L.M.N. She also agreed that she had, in the past, "exhibited some uncontrollable anger" toward L.M.N. Conversely, mother testified that she did not have any "anger issues" and did not understand why she needed to attend anger management classes. And several witnesses testified that mother had never taken responsibility for the many injuries that she had caused L.M.N.

A parent's violent or abusive conduct can produce an environment that endangers a child's well-being. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet). And direct physical abuse clearly endangers a child. *In re P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at *8 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. denied) (mem. op.); *In re K.R.G.*, No. 01-16-00537-CV, 2016 WL 7368082, at *9 (Tex. App.—Houston [1st Dist.] Dec. 15, 2016, pet. denied) (mem. op.); *In re I.J.A.*, No. 04-09-00787-CV, 2010 WL 2403728, at *4 (Tex. App.—San Antonio June 16, 2010, no pet.) (mem. op.). Here, there is ample evidence that L.M.N. was severely physically abused by mother on several occasions.

41

In regard to D.Y.L.N. and J.J.L.N., although DFPS caseworker Beaty testified that allegations also arose related to physical abuse of them, the record does not contain specific evidence that either child was physically abused by mother or father. However, L.M.N. was afraid that if D.Y.L.N. or J.J.L.N. were returned home, they would also be abused. Further, D.Y.L.N. told her therapist, Dr. Earls, that while living with mother and father, she "had been left in a closet" so that she would "not see [L.M.N. being] hurt." And, while living with mother and father, she had actually seen L.M.N. "being hit." *See In re N.B.*, No. 06-12-00007-CV, 2012 WL 1605457, at *10 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.) (evidence child witnessed physical abuse supported endangerment finding); *In re T.S.*, No. 02-10-00089-CV, 2010 WL 4486332, at *7 (Tex. App.—Fort Worth Nov. 10, 2010, no pet.) (mem. op.) (evidence children witnessed mother's abusive and assaultive behavior supported endangerment finding). Moreover, Earls noted that D.Y.L.N. appeared "[s]haken" when she disclosed the physical abuse of L.M.N., and she had anxiety and fear about returning home.

Further, several witnesses testified that it would be in the best interest of the children, including D.Y.L.N. and J.J.L.N., to remain in their current placement because of the "severity of abuse" that L.M.N. had endured while living with mother and father. And the children's therapist opined that allowing the children, including D.Y.L.N. and J.J.L.N., to return to the home of mother and father would

42

"re-traumatiz[e]" them. Beaty also opined that mother's history of physical abuse constituted conduct that had put the children in physical and emotional danger, including D.Y.L.N. and J.J.L.N. According to Gomez, D.Y.L.N. and J.J.L.N. risked being subjected to physical abuse if they were returned to the care of mother and father, and they would be in "grave danger" because of the physical abuse that L.M.N. had suffered.

Violent or abusive acts directed toward one child can endanger other children that are not the direct victims of the abuse in question and support termination of parental rights as to the other children, even if the other children were not yet born at the time of the conduct. *See In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied); *In re W.J.H.*, 111 S.W.3d 707, 716 (Tex. App.—Fort Worth 2003, pet. denied); *Dir. of Dall. Cty. Child Protective Servs. Unit of Tex. Dep't of Human Servs. v. Bowling*, 833 S.W.2d 730, 733–34 (Tex. App.—Dallas 1992, no writ); *see also Boyd*, 727 S.W.2d at 533 (endangering acts need not be committed in child's presence, directed at child, or cause physical injury to child). In other words, a parent's physical abuse of one child in the home supports a finding of endangerment as to the other children also present in the home. *In re E.A.G.*, 373 S.W.3d 129, 142–43 (Tex. App.—San Antonio 2012, pet. denied); *see also In re Baby Boy R.*, 191 S.W.3d 916, 925 (Tex. App.—Dallas 2006, pet. denied) (evidence of abuse directed at one child allows fact finder to infer parent "engaged in conduct

that will endanger or jeopardize the physical or emotional well-being of other children in the home who may discover the abuse or be abused themselves"); *In re R.W.*, 129 S.W.3d at 742 ("[E]vidence of sexual abuse of one child is sufficient to support a finding of endangerment with respect to other children."). And the fact that one child witnesses violence directed at another child in the home supports a finding of endangerment. *See In re E.J.Z.*, 547 S.W.3d 339, 350 (Tex. App.—Texarkana 2018, no pet.); *see also In re P.M.B.*, 2017 WL 6459554, at *10 (evidence of child's exposure to violence supports endangerment finding); *In re K.S.*, No. 02-14-00073-CV, 2014 WL 3867529, at *9–10 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.) (evidence sufficient to support termination under subsections D and E where children witnessed violence in home).

Further, in regard to father, we note that there is no evidence that he physically abused any of the children. However, when the children entered the care of DFPS, L.M.N. had visible bruising on her face, arms, hands, and back. In fact, a "Court Report" from Child Advocates, states that on November 13, 2014, L.M.N. went to school with "two black eyes that were swollen and black in color." "Her back, arms and hands were also full of discolored and scattered bruises" and her lip "had a blister which may or may not have been a fever blister." Former DFPS caseworker Scott also saw "bruises behind [L.M.N.'s] ear" and "a lot of scratches on the back of her neck."

Several witnesses expressed concern about father's ability to protect the children from physical abuse by mother. For instance, Beaty noted that L.M.N. was physically abused while father lived in the home and he "did not do anything when th[at] abuse was going on." And Gomez opined that father was not protective of the children and he "could not speak up for himself or speak out independently." Gomez further noted that it was important for mother "to take responsibility for the physical abuse of [L.M.N.]" and for father "to take responsibility [for not] . . . being protective" of L.M.N. However, neither parent had ever taken responsibility for what had happened to L.M.N. while in their care.

Further, Gomez noted that L.M.N. had been abused more than once, and although L.M.N. sustained "all [of] these bruises" and "injuries" while in the care of mother and father, neither party could explain how they had occurred, except for stating that mother had hit L.M.N. with a shoe on one occasion. Gomez opined that a "one-time hitting" incident was not "consistent with all of the bruising and all of the scars" found on L.M.N.

Although father testified that he was not home when mother hit L.M.N. with the shoe, the record indicates that L.M.N. was physically abused by mother on more than one occasion. And he testified that mother cared for the children and he knew that she was easily overwhelmed. Father also knew that L.M.N. did not want to be in the home and would "get kind of upset sometimes." Moreover, he knew that

45

mother and L.M.N. had problems or tension that prompted them to go to therapy even prior to DFPS's involvement in this case. Father contradicted himself at trial about whether mother had anger issues prior to the children entering the care of DFPS. Father characterized mother's actions in hitting L.M.N. with a shoe as merely an "accident," and he minimized the incident, blaming it on mother's medication.

Further, although father testified that he had never seen bruises or marks on L.M.N. because he was not responsible for dressing the children, L.M.N.'s bruises, particularly those on her face and hands, were visible irrespective of the clothing that she was wearing. And father stated that he played with the children when he arrived home, and he and mother took L.M.N. to school. In fact, it was at school where L.M.N.'s "two black eyes that were swollen and black in color" and bruised back, arms, and hands were observed. *See Jordan*, 325 S.W.3d at 713 (trier of fact sole judge of credibility of witnesses and weight to give their testimony). Notably, father still lives in the same home as mother, has supported mother throughout the case, and has offered no living arrangement for D.Y.L.N. and J.J.L.N., except for his home with mother, should they be returned to his care. *See In re J.N.S.*, No. 13-17-00356-CV, 2018 WL 286090, at *5 (Tex. App.—Corpus Christi Jan. 4, 2018, no pet.) (mem. op.) (considering whether parent's continued cohabitation with other parent put children at risk).

In order to support a finding of endangerment, a parent need not have certain knowledge that an actual injury is occurring, so long as the parent is at least aware of the potential for danger to the child in such an environment and disregarded that risk. *In re S.M.L.*, 171 S.W.3d at 477–78; *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.). And a parent's failure to take steps to protect a child when he knows that she is at risk supports an endangerment finding. *In re A.L.*, No. 04-14-00365-CV, 2014 WL 5197774, at *3 (Tex. App.—San Antonio Oct. 15, 2014, no pet.) (mem. op.). Further, evidence that a parent does not remove a child from, or allows a child to remain in a home in which violent conduct occurs, supports termination of that parent's rights. *In re A.V.W.*, No. 13-12-00684-CV, 2013 WL 1932887, at *5 (Tex. App.—Corpus Christi May 9, 2013, pet. denied) (mem. op.); *see also In re T.S.*, 2010 WL 4486332, at *7 (parent continually placed children in environment where violence took place).

Moreover, as previously noted, a fact finder may infer from a parent's past conduct endangering the well-being of a child that similar conduct will recur in the future. *See A.S.*, 394 S.W.3d at 712; *Jordan*, 325 S.W.3d at 724; *see also In re D.S.*, 333 S.W.3d at 384. And a parent's endangering conduct toward one child may be considered to determine whether the parent engaged in behavior that endangered other children in the home. *See In re S.H.*, 2017 WL 4542859, at *11.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being or mother engaged, or knowingly placed D.Y.L.N. and J.J.L.N. with persons who engaged, in conduct that endangered their physical and emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). And, viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being or she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical and emotional well-being. *See id.*

Further, viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that father knowingly placed, or knowingly allowed D.Y.L.N. and J.J.L.N. to remain, in conditions or surroundings which endangered their physical and emotional well-being or father engaged, or knowingly placed D.Y.L.N. and J.J.L.N. with persons who engaged, in conduct that endangered their physical and emotional well-being. *See id.* And, viewing the evidence in a neutral light, we conclude that

48

a reasonable fact finder could have formed a firm belief or conviction that father knowingly placed, or knowingly allowed D.Y.L.N. and J.J.L.N. to remain, in conditions or surroundings which endangered their physical and emotional well-being or he engaged, or knowingly placed D.Y.L.N. and J.J.L.N. with persons who engaged, in conduct that endangered their physical and emotional well-being. *See id.*

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being or mother engaged, or knowingly placed D.Y.L.N. and J.J.L.N. with persons who engaged, in conduct that endangered their physical and emotional well-being. *See id.* And we hold that the evidence is factually sufficient to support the trial court's finding that mother engaged, or knowingly placed L.M.N. with persons who engaged, in conduct that endangered her physical and emotional well-being. *See id.*

We further hold that the evidence is legally and factually sufficient to support the trial court's finding that father knowingly placed, or knowingly allowed D.Y.L.N. and J.J.L.N. to remain, in conditions or surroundings which endangered their physical and emotional well-being or father engaged, or knowingly placed

D.Y.L.N. and J.J.L.N. with persons who engaged, in conduct that endangered their physical and emotional well-being. *See id.*

We overrule mother's first and second issues and father's first issue.[42]

*Best Interest*

In her fourth issue, mother argues that the evidence is factually insufficient to support the trial court's finding that termination of her parental rights is in the best interest of the children because "[t]he record shows [that she] . . . made [a] grave mistake and had remorse"; she completed her FSP and "learned"; she was not "presently unfit"; "[t]he children . . . receiv[ed] counseling"; she "participated in visits and in any [programs] that were necessary"; she "planned to behave differently when the children were returned to the home"; she had "always provided food, clothing, shelter, education and love to [the] children"; there is no evidence of "any current or future physical danger"; she "demonstrated absolute dedication to [the] children and to obtaining reunification with them"; "[t]he stability of her home, marriage, work and sobriety [are] not in question"; and she was "pregnant and on medications that made her feel anxiety" when she struck L.M.N. with the shoe.

---

[42]    Having held that the evidence is legally and factually sufficient to support the trial court's findings under sections 161.001(b)(1)(D) and (E), we need not address mother's third issue and father's second issue challenging the trial court's findings under Texas Family Code section 161.001(b)(1)(O). *See In re A.V.*, 113 S.W.3d 355, 363 (Tex. 2003); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 618 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also* TEX. R. APP. P. 47.1.

In his third issue, father argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in the best interest of D.Y.L.N. and J.J.L.N. because he "did everything possible to prevent [D.Y.L.N. and J.J.L.N.] from becoming alienated"; "attended every visit, court date, and family conference[]"; "expeditiously completed his FSP"; was "not a future danger to" D.Y.L.N. and J.J.L.N.; had no criminal or DFPS history; "plan[ned] to devote more time to [D.Y.L.N. and J.J.L.N.] and be more alert to what happens at home"; had "a suitable home and the financial means to support" D.Y.L.N. and J.J.L.N.; was not "present when [L.M.N.] was injured"; and "never saw [m]other harm [L.M.N.]"; and he asserts that it is in the best interest of D.Y.L.N. and J.J.L.N. to "remain with their biological parent."

A strong presumption exists that a child's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). However, the best interest analysis evaluates the best interest of the child, not the parent. *See In re D.S.*, 333 S.W.3d at 384.

In determining whether the termination of mother's parental rights is in the best interest of the children or whether the termination of father's parental rights is in the best interest of D.Y.L.N. and J.J.L.N., we may consider several factors, including: (1) a child's desires; (2) the current and future physical and emotional

51

needs of a child; (3) the current and future emotional and physical danger to a child; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for a child by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re L.M.*, 104 S.W.3d at 647.

The *Holley* factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to the termination of parental rights. *See In re C.H.*, 89 S.W.3d at 27; *see also In re C.L.C.*, 119 S.W.3d at 399 ("[T]he best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors."). The same evidence of acts and omissions used to establish grounds for termination under section 161.001(b)(1) may also be relevant to determining the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28; *In re L.M.*, 104 S.W.3d at 647.

In regard to the children's desires, L.M.N. and D.Y.L.N. had both explicitly expressed a desire to remain in their current placement with their foster parents and not to return home. L.M.N. is afraid to return home, afraid of mother, and afraid that she will be physically abused again if returned to mother's care. She had not had any contact with mother since 2015 and had actively hidden from mother when

her foster father, J.C., had taken or picked up her siblings from their visits with mother and father. Although L.M.N. was only nine years old at the time that the trial court terminated mother's parental rights, her desire to not return to mother's care had been clear and unwavering since the initiation of the case. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (child had not seen parent "in almost a year"); *C.H. v. Dep't of Family & Protective Servs.*, Nos. 01-11-00385-CV, 01-11-00454-CV, 01-11-00455-CV, 2012 WL 586972, at *9 (Tex. App.—Houston [1st Dist.] Feb. 23, 2012, pet. denied) (mem. op.) (evidence supported best interest finding where children expressed their fear of parent and desire not to return to parent's care); *In re C.M.C.*, 273 S.W.3d 862, 876 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (child afraid of parent and "adamant that he d[id] not want to return to live with her and want[ed] to remain with his current family").

Although J.J.L.N. was three years old when the trial court terminated the parental rights of mother and father and had not expressed his desires, there is ample evidence that he is doing very well in his foster home and is "very bonded" with his foster parents. In fact, all three of the children are thriving in their current placement with their foster parents, who are meeting their emotional, psychological, and physical needs, and the children are not only bonded with their foster family, but are also strongly bonded to each other. *See In re M.L.R-U., Jr.*, 517 S.W.3d 228, 238

53

(Tex. App.—Texarkana 2017, no pet.) (considering evidence foster family provided safe and healthy environment when determining children's desires).

D.Y.L.N. has spent the majority of her life with her foster parents, and the foster family is the only family that J.J.L.N. has ever known. The children all refer to their foster parents as "[m]om" and "[d]ad," while they call mother and father by their names or "[a]unt and [u]ncle." J.C. opined that J.J.L.N. does not realize that mother and father are his parents. *See In re J.S.B.*, Nos. 01-17-00480-CV, 01-17-00481-CV, 01-17-00484-CV, 2017 WL 6520437, at *17 (Tex. App.— Houston [1st Dist.] Dec. 17, 2017, pet. denied) (mem. op.) (children did not recognize parent as their parent and had spent majority of life living away from parent). A child's bonding with her foster family implies that the child's desires would be fulfilled by adoption by the foster family. *In re T.C.C.H.*, No. 07-11-00179-CV, 2011 WL 6757409, at *9 (Tex. App.—Amarillo Dec. 22, 2011, no pet.) (mem. op.); *In re U.P.*, 105 S.W.3d at 230. And when a child is too young to express her desires, a fact finder may consider evidence that the child is bonded with her foster family, receiving good care in the current placement, and has spent minimal time with a parent.[43] *In re J.D.*, 436 S.W.3d at 118.

---

[43] Mother and father did testify that D.Y.L.N. and J.J.L.N. are happy to see them at visits and hug them. And DFPS caseworker McBride did testify that D.Y.L.N. and J.J.L.N. interact with mother and father at visits. However, this is not dispositive of the best interest analysis. *See, e.g., In re W.S.M.*, 107 S.W.3d 772, 773 (Tex. App.— Texarkana 2003, no pet.).

In regard to the children's current and future physical and emotional needs, we note that none of them have special needs,[44] but they all see a therapist because of being in the care of DFPS and the physical abuse suffered by L.M.N. While living with mother and father, L.M.N. was repeatedly physically abused by mother. Mother threw "cleaning supplies" and dishes at her and "hit her with brooms and mops." Mother "would put [L.M.N.'s] hands under the hot water faucet" and "hit [her] with a belt on her arms." Mother also hit L.M.N. "on the head with a cell phone charger" "and "pushed [her] into a door," causing her to bleed and require stitches. L.M.N. stated that mother was "mean to her," "whoop[ed] her," "hit her," "ignored" her, and "put [her] in" or "locked" her in a closet.[45]

A "Court Report" from Child Advocates, admitted into evidence at trial, states that "[o]n November 13, 2014, [DFPS] received a referral alleging physical abuse of [a then] 6 year old [L.M.N.] by [mother]." L.M.N. went to school with "two black eyes that were swollen and black in color."[46] "Her back, arms and hands were also

---

[44]    J.C. noted that when L.M.N. came to live with his family she was in the first grade and not doing well in school. *See In re J.S.B.*, Nos. 01-17-00480-CV, 01-17-00481-CV, 01-17-00484-CV, 2017 WL 6520437, at *18 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.) (when children entered care of DFPS, they had educational issues and were behind in school).

[45]    L.M.N. disclosed to J.C. that she had suffered abuse while living with mother and father, including having her hand put under hot water, being pushed into doors, and being forced to do work.

[46]    While L.M.N. was in their care, mother and father took her to school.

full of discolored and scattered bruises" and her lip "had a blister which may or may not have been a fever blister."

Photographs of L.M.N., admitted into evidence at trial, show visible bruising on the child's face, arm, and back. And the FSPs of mother and father state that L.M.N., when she entered care, had bruises that "covered her back," "both arms," and the left side of her face. DFPS caseworker Scott testified that she saw "bruises behind [L.M.N.'s] ear" and "a lot of scratches on the back of her neck." And L.M.N. disclosed to Gomez that the incidents of physical abuse by mother occurred at different times and she had been physically abused on several occasions. *See Jordan*, 325 S.W.3d at 724 ("Evidence as to how a parent has treated [one] child . . . is relevant . . . .").

A parent who lacks the ability to provide a child with a safe and stable home is unable to provide for a child's emotional and physical needs. *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14 Dist.] 2014, no pet.); *see also In re B.J.*, No. 01-15-00886-CV, 2016 WL 1389054, at *10–11 (Tex. App.—Houston [1st Dist.] Apr. 7, 2016, no pet.) (mem. op.) (parent, who did not demonstrate she could provide safe and stable home, unable to meet children's needs); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.) (child's need for stable, permanent home paramount consideration in best interest determination). And a fact finder may infer from a parent's past inability to meet a child's physical and

emotional needs an inability or unwillingness to meet a child's needs in the future. *In re J.D.*, 436 S.W.3d at 118; *see also Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (parent's history of failing to provide children with "stable and nurturing environment" demonstrates termination of parental rights in best interest).

Further, several witnesses testified that it was in the children's best interest to remain in their current placement with their foster parents because it was a safe and stable home and the children's foster parents were meeting their emotional, psychological, and physical needs. The children had never expressed any fears related to their foster parents or reported any abuse or neglect by them. Dr. Earls, the children's therapist, opined that it would be emotionally detrimental if either L.M.N. or D.Y.L.N. were to be returned home, and a "Permanency Plan and Progress Report to the Court," admitted into evidence at trial, states that it would be "re-traumatizing" for the children to return home. Neither L.M.N. nor D.Y.L.N. wanted to return to the care of mother and father, and the foster family was the only home that J.J.L.N. had ever known. Moreover, the children are very bonded to each other and their foster parents, and J.C. opined that separating them would be harmful and emotionally difficult for them. *See In re K.C.*, 219 S.W.3d at 931 (child's need for stable, permanent home paramount consideration in best interest determination); *Adams*, 236 S.W.3d at 280 (relying on evidence "it would be in the children's best

57

interest to be raised in a consistent, stable, and nurturing environment"); *see also In re A.M.*, 495 S.W.3d 573, 581 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (foster parents provided stable home where children received counseling and thriving).

In regard to the current and future emotional and physical danger to the children, as noted above, L.M.N., while living with mother and father, was repeatedly physically abused by mother. *See Jordan*, 325 S.W.3d at 724 ("Evidence as to how a parent has treated [one] child . . . is relevant . . . ."). And she feared that she would experience abuse again if she was returned home. She also feared that D.Y.L.N. and J.J.L.N. would be abused if they were returned to the care of mother and father. D.Y.L.N. reported to Dr. Earls, her therapist, that she had actually seen L.M.N. "being hit" and she, while previously living with mother and father, "had been left in a closet" so that she would "not see [L.M.N. being] hurt." When D.Y.L.N. told Earls about this, she appeared "[s]haken." Earls also explained that on several occasions the children required emergency therapy sessions after visits with mother and father because of "their anxiety and fears about returning" home.

Several witnesses also testified that mother had not "take[n] responsibility for the physical abuse of [L.M.N.]" and father had not "take[n] responsibility [for not] . . . being protective" of the child. Further, Gomez opined that father had not demonstrated how he would protect the children if they were returned home. And

both parents excused mother's behavior of hitting L.M.N. with a shoe by blaming it on "depression" and the "taking [of] Prozac" and by characterizing it as an "accident." Neither mother nor father ever offered a viable explanation for the many bruises and scars found on L.M.N. And Gomez opined that the children would be in "grave danger" if they were returned home because of the physical abuse that L.M.N. had suffered.

Further, Dr. Earls testified that it would be emotionally detrimental if either L.M.N. or D.Y.L.N. were returned to the care of mother and father. And J.C. opined that it would be harmful for the children to be separated from each other because D.Y.L.N. would think that she did something "wrong" and "the only consistent thing in [J.J.L.N.'s] life ha[d] been [L.M.N.]."

Evidence of violence in the home supports a finding that the placement of a child with her parent is likely to subject the child to emotional and physical danger now and in the future. *In re J.S.-A*, No. 01-17-00491-CV, 2018 WL 891236, at *8 (Tex. App.—Houston [1st Dist.] Feb. 15, 2018, pet. denied) (mem. op.); *In re O.N.H.*, 401 S.W.3d 681, 685 (Tex. App.—San Antonio 2013, no pet.) ("[I]t was a form of abuse for the children to be exposed to an environment where physical abuse occurred even if it was not directed toward them."); *In re J.I.T.P.*, 99 S.W.3d at 846 (exposure to violence, even when child not intended victim, supports finding termination in child's best interest). And a parent's inability or unwillingness to

protect a child from repeated abuse is a relevant consideration. *See In re A.A.T.*, No. 04-16-00344-CV, 2016 WL 7448370, at *15 (Tex. App.—San Antonio Dec. 28, 2016, no pet.) (mem. op.); *see also In re S.B.*, 207 S.W.3d 877, 886–87 (Tex. App.—Fort Worth 2006, no pet.) (parent's violent behavior while children in home placed them in severe emotional danger).

Further, a parent's past performance as a parent is relevant to a determination of her present and future abilities to provide for a child. *In re C.H.*, 89 S.W.3d at 28; *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (trial court may measure parent's future conduct by past conduct); *see also Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.) ("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases.").

In regard to parental abilities, plans for the children, and the stability of the proposed placement, L.M.N., while living with mother and father, suffered many incidents of physical abuse, which left her extensively bruised and injured. And D.Y.L.N., while living with mother and father, was placed in a closet so that she would not see L.M.N. being "hurt," although she reported that she had actually seen L.M.N. "being hit." Mother admitted to hitting L.M.N. with a shoe because she was frustrated with the child, and she also admitted that a pot of boiling tomatoes had fallen on L.M.N.'s hand because she had left it unattended on the kitchen stove.

Mother and father also could not adequately explain the extensive bruising sustained by L.M.N. while in their care, and they contradicted themselves at trial as to whether or not mother had "anger issues." Mother did admit to having problems controlling her anger, and agreed that she had, in the past, "exhibited some uncontrollable anger" toward L.M.N. However, she also did not understand why she needed to attend anger management classes. And neither mother nor father ever took responsibility for their role in the physical abuse suffered by L.M.N., with both parents excusing mother's abusive behavior. *See P.A.G. v. Tex. Dep't of Family & Protective Servs.*, 458 S.W.3d 595, 612–13 (Tex. App.—El Paso 2014, no pet.) (comparing parental abilities of parent and foster parent and noting parent's home abusive); *see also In re C.H.*, 89 S.W.3d at 28 (parent's past performance as parent relevant to determination of present and future ability to provide for child); *In re E.D.*, 419 S.W.3d at 620 (trial court may measure parent's future conduct by past conduct); *Schaban*, 238 S.W.3d at 824 ("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases.").

DFPS caseworker Beaty also expressed concern about mother's inability to redirect D.Y.L.N.'s behavior when she acted inappropriately during family visits. *See C.V. v. Tex. Dep't of Family & Protective Servs.*, 408 S.W.3d 495, 506–07 (Tex. App.—El Paso 2013, no pet.) (evidence sufficient to support finding termination of

parental rights in best interest where parent lacked abilities to redirect children's behavior).

If the children were returned to the home of mother and father, mother stated that she "would tell them how much [she] love[d] them" and "would make them happy every day." She would also not "pay attention to the bad things" and "only pay attention to the good things." According to mother, she should play with the children more and spend more time with them; she should not focus on "things that need[] to be done around the house." She should "[f]ocus on their education" and "treat [the] children better." Father noted that mother is currently pregnant with twins and he is still working full-time. Father will "be busy" but plans to "have more precaution[s] to check" on the children if they are returned to his and mother's care. Father was not concerned about mother taking care of a total of five children after the birth of their twins, despite knowing that she was easily overwhelmed while caring for the children in the past. *See In re S.P.M.*, No. 07-13-00282-CV, 2014 WL 241796, at *8 (Tex. App.—Amarillo Jan. 21, 2014, no pet.) (given parents' past performance, fact finder free to reject their assertions of future stability and having learned from their mistakes); *C.V.*, 408 S.W.3d at 506–07 (evidence sufficient to support finding termination of parental rights in best interest where parent became overwhelmed and failed to protect children from exposure to violence).

J.C. testified that the children currently live with him, his wife, and his nine-year old daughter in a home. The children had been living with his family for almost three years. J.C. and his wife provided the children with food, clothing, and "everything [that] they needed." In their rooms at their foster parents' home, the children had toys, books, beds, and stuffed animals. And recently, J.C. and his wife had taken the children to visit San Diego for spring break.

While L.M.N. was in the care of her foster parents, she improved academically and enjoyed science and reading. She had friends and participated in soccer and karate. She speaks both English and Spanish, is "a very outdoor person," and "loves outside activities" and camping, which the family does frequently. L.M.N. gets along well with her siblings, has a good relationship with both D.Y.L.N. and J.J.L.N., and is very bonded with them. She is protective of D.Y.L.N. and J.J.L.N., and she engages and plays with them. After school, L.M.N. and D.Y.L.N. do their homework together and play dolls. And the children "hug each other a lot."

Since D.Y.L.N. began living with her foster parents, her relationship with her siblings has improved and she has strongly bonded with them. She is a "great big sister" to J.J.L.N., plays with him, is very close with him, holds his hand, and is protective of him. D.Y.L.N. is in kindergarten and is "doing great." She "show[s] progress from semester to semester," and she attends the same school as J.C.'s nine-year-old daughter. D.Y.L.N. has friends and plays with them at the park and

63

the neighborhood pool. She primarily speaks English now and refuses to speak Spanish, although she understands it.[47]

In regard to J.J.L.N., while in the care of his foster parents, he previously attended daycare, but now is being tutored by J.C.'s in-laws, who are former teachers. J.J.L.N. was doing great at daycare and is doing "really good" with tutoring. He is developmentally on target for his age and does not have any delays. He gets along with both L.M.N. and D.Y.L.N. and is very bonded with them. He asks his sisters to play, go swimming, and watch Mickey Mouse with him. The children play together often, and J.J.L.N. eats snacks with his sisters when they get home from school.

J.C. testified that he and his wife would like to adopt the children, and he opined that it would be in the children's best interest to be adopted by his family.[48] *See In re M.M.M.*, Nos. 01-17-00980-CV, 01-17-00981-CV, 2018 WL 1954178, at *16 (Tex. App.—Houston [1st Dist.] Apr. 26, 2018, pet. denied) (mem. op.) (children in adoptive placements and thriving and happy). The children refer to J.C. and his wife as "[d]ad" and "[m]om." J.C. opined that J.J.L.N. did not realize that

---

[47] The record indicates that mother and father speak Spanish. Mother testified that she does not speak or read English.

[48] J.C. noted that even if D.Y.L.N. and J.J.L.N. were returned to the care of mother and father, he and his wife would still want to adopt L.M.N.

mother and father were his parents. And D.Y.L.N. saw J.C. and his wife as "her parents."

Several witnesses testified that the children are "very bonded" with their foster parents, who "treat[] the[] [children] as their own"; "[t]hey fe[el] like they [are] family." The children are thriving in their placement and are adjusted, and their educational, emotional, psychological needs are being met. The children's current placement is a safe, stable, and emotionally supportive. *See In re J.D.*, 436 S.W.3d at 119–20 ("Stability and permanence are paramount in the upbringing of children."); *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (noting stability and permanence important to upbringing of child and affirming termination in best interest when child thriving in foster care); *In re K.C.*, 219 S.W.3d at 931 (child's need for stable, permanent home paramount consideration in best interest determination); *see also In re T.A.S.*, No. 05-15-01101-CV, 2016 WL 279385, at *6 (Tex. App.—Dallas Jan. 22, 2016, no pet.) (mem. op.) (considering children's improvement in foster care and noting they had "stabilized and w[ere] functioning well in . . . foster home").

In regard to acts or omissions that may indicate that the parent-child relationship is not proper, a parent's inability to provide a stable home supports a finding that termination of parental rights is in the best interest of a child. *See In re B.J.*, 2016 WL 1389054, at *13; *In re S.B.*, 207 S.W.3d at 887–88.

Here, mother physically abused L.M.N. on several occasions, and D.Y.L.N. saw L.M.N. "being hit" or was placed in a closet so that she would not see L.M.N. being "hurt." *See In re E.G.*, No. 02-14-00351-CV, 2015 WL 1262631, at *13 (Tex. App.—Fort Worth Mar. 19, 2015, no pet.) (mem. op.) (prevalence of violence in home when child lived with parent constitutes act or omission indicating existing parent-child relationship not proper). Mother testified that she had hit L.M.N. with a shoe, which resulted in bruising, but she and father both excused her behavior, with father characterizing it as an "accident." Beaty noted that L.M.N. was physically abused while father lived in the home and he "did not do anything when th[at] abuse was going on." And Gomez opined that father was not protective of the children, and he "could not speak up for himself or speak out independently." Neither parent took responsibility for what had happened to L.M.N. while in their care. *See In re N.M.L.*, No. 07-17-00310-CV, 2018 WL 542719, at *8 (Tex. App.—Amarillo Jan. 19, 2018, pet. denied) (mem. op.) (engaging in conduct endangering children's physical and emotional well-being constitutes act or omission by parent indicating parent-child relationship not proper); *In re A.A.T.*, 2016 WL 7448370, at *17–18 (considering parent's excuses regarding child's abuse); *In re S.W.*, No. 2-05-417-CV, 2006 WL 2988736, at *7 (Tex. App.—Fort Worth Oct. 19, 2006, no pet.) (mem. op.) (parent attempted to justify her abusive conduct).

Viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of mother's parental rights is in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). And we conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of mother's parental rights is in children's best interest or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that termination is in the best interest of the children.

Further, viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of father's parental rights is in the best interest of D.Y.L.N. and J.J.L.N. *See id.* And viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of father's parental rights is in the best interest of D.Y.L.N. and J.J.L.N. *See id.* We further conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of father's parental rights is in the best interest of D.Y.L.N. and J.J.L.N. or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that termination is in the best interest of D.Y.L.N. and J.J.L.N.

Accordingly, we hold that the evidence is factually sufficient to support the trial court's finding that termination of mother's parental rights is in the best interest of the children. *Id.* We further hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of father's parental rights is in the best interest of D.Y.L.N. and J.J.L.N. *Id.*

We overrule mother's fourth issue and father's third issue.

## Permanent Managing Conservatorship

In her fifth issue, mother argues that the trial court erred in appointing DFPS as the children's permanent managing conservator because the evidence is legally and factually insufficient to establish that the appointment of her would significantly impair the children's "physical health or emotional development" or that the appointment of DFPS was in the children's best interest.[49]

The Family Code creates a rebuttable presumption that a parent will be named the child's managing conservator unless the court finds that such appointment would not be in her best interest "because the appointment would significantly impair the child's physical health or emotional development." TEX. FAM. CODE ANN.

---

[49] In his fourth issue, father asserts that the trial court erred in appointing DFPS as the permanent managing conservator of D.Y.L.N. and J.J.L.N. However, he requests that the Court address this issue only "if [we] reverse[] the judgment terminating [his parental] rights." Accordingly, we do not address father's permanent-managing-conservator complaint. *See* TEX. R. APP. P. 47.1; *In re T.C.*, No. 01-17-00497-CV, 2018 WL 4126600, at *28 n.55 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, no pet. h.) (mem. op.).

§ 153.131(a) (Vernon 2014). However, the Family Code also provides: "If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, [DFPS], or a licensed child-placing agency as managing conservator of the child." *Id.* § 161.207(a) (Vernon Supp. 2018); *see also In re S.M.G.*, No. 01-17-00056-CV, 2017 WL 2806332, at *8 (Tex. App.—Houston [1st Dist.] June 29, 2017, pet. denied) (mem. op.) ("When the parents' parental rights have been terminated, Family Code section 161.207 governs the appointment of a managing conservator."); *In re M.M.M.*, No. 01-16-00998-CV, 2017 WL 2645435, at *17 (Tex. App.—Houston [1st Dist.] June 16, 2017, no pet.) (mem. op.) (parental presumption applies only when parental rights not terminated). In this case, the trial court appointed DFPS as sole managing conservator of the children after terminating the parental rights of mother, father, and the unknown father of L.M.N.

Termination of parental rights and appointment of a non-parent as sole managing conservator are two distinct issues, requiring different elements, different standards of proof, and different standards of review. *Compare* TEX. FAM. CODE ANN. § 161.001, *with id.* § 153.131(a); *see also In re J.A.J.*, 243 S.W.3d 611, 615–17 (Tex. 2007). Unlike the standard of proof for termination of parental rights, the findings necessary to appoint a non-parent as sole managing conservator need only be established by a mere preponderance of the evidence. *See* TEX. FAM. CODE ANN.

§ 105.005 (Vernon 2014); *In re J.A.J.*, 243 S.W.3d at 616. Likewise, the standard of review for the appointment of a non-parent as sole managing conservator is less stringent than the standard of review for termination of parental rights. *In re J.A.J.*, 243 S.W.3d at 616; *In re A.C.*, 394 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2012, no pet.). We review a trial court's appointment of a non-parent as sole managing conservator for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d at 616; *Earvin v. Dep't of Family & Protective Servs.*, 229 S.W.3d 345, 350 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Therefore, we reverse the trial court's appointment of a non-parent as sole managing conservator only if we determine that the appointment is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d at 616; *Earvin*, 229 S.W.3d at 350. We view the evidence in the light most favorable to the trial court's decision and indulge every legal presumption in favor of its judgment. *Earvin*, 229 S.W.3d at 350. A trial court abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). However, an abuse of discretion does not occur if the trial court bases its decision on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

An order terminating the parent-child relationship divests a parent of all legal rights and duties with respect to the child. *See* TEX. FAM. CODE ANN. § 161.206(b)

70

(Vernon Supp. 2018). Here, having made termination findings on the predicate grounds found in Family Code section 161.001(b)(1) and best interest, the trial court was required under section 161.207 to appoint DFPS, or another permissible adult or agency, as the children's managing conservator. *See In re L.G.R.*, 498 S.W.3d 195, 207 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *see also In re S.M.G.*, 2017 WL 2806332, at *8 (when parental rights terminated section 161.207 controls appointment of managing conservator). In other words, the appointment of DFPS in this case may be considered a "consequence of the termination" of mother's parental rights. *See In re L.G.R.*, 498 S.W.3d at 207 (internal quotations omitted); *see also In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *12 (Tex. App.— Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.).

As discussed above, the evidence is legally and factually sufficient to support the trial court's termination of mother's parental rights to the children. *See In re S.R.*, 452 S.W.3d 351, 359 n.3 (Tex. App.—Houston [14th Dist.] Nov. 13, 2014, pet. denied) ("A trial court does not abuse its discretion in appointing [DFPS] as conservator of the children where the evidence is sufficient to support termination of parental rights."). Because we have overruled mother's challenge to the portion of the trial court's order terminating her parental rights, the order has divested her of her legal rights and duties related to the children. *See* TEX. FAM. CODE ANN. § 161.206(b); *E.A. v. Tex. Dep't of Family & Protective Servs.*, No.

03-15-00811-CV, 2016 WL 1639847, at *4 (Tex. App.—Austin Apr. 21, 2016 pet. denied). Accordingly, we hold that mother now lacks standing to challenge the appointment of DFPS as the children's permanent managing conservator.[50] *See In re C.E.C.*, No. 05-17-01482-CV, 2018 WL 3062454, at *8 (Tex. App.—Dallas June 21, 2018, no pet.) (mem. op.); *In re D.K.W., Jr.*, No. 01-17-00622-CV, 2017 WL 6520439, at *5 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.); *see also Quiroz v. Dep't of Family & Protective Servs.*, No. 01-08-00548-CV, 2009 WL 961935, at *11 (Tex. App.—Houston [1st Dist.] Apr. 9, 2009, no pet.) (mem. op.) (refusing to address parent's complaint evidence insufficient to support DFPS's appointment as sole managing conservator where evidence sufficient to support termination of parent's rights).

We overrule mother's fifth issue.

---

[50]    We note that in cases where a trial court's termination of the parent-child relationship is reversed, a parent is required to independently challenge a trial court's finding under Family Code section 153.131(a) in order to obtain reversal of the conservatorship appointment. *See In re J.A.J.*, 243 S.W.3d 611, 616–17 (Tex. 2007).

## Conclusion

We affirm the order of the trial court.

                                        Terry Jennings
                                        Justice

Panel consists of Justices Jennings, Higley, and Massengale.